818 A.2d 455 (2003)
358 N.J. Super. 524
SEACOAST BUILDERS CORPORATION, Plaintiff-Appellant,
v.
RUTGERS, The State University, Defendant-Respondent, and
Smith-Midland Corporation, Defendant-Appellant, and
Grad Associates, P.A., Defendant.[1]
Superior Court of New Jersey, Appellate Division.
Argued February 4, 2003.
Decided March 24, 2003.
*457 Joseph A. Battipaglia, Philadelphia, PA, argued the cause for appellant Seacoast Builders Corporation (Duane Morris, attorneys; Mr. Battipaglia, on the brief).
Douglas A. Franklin, River Edge, argued the cause for appellant Smith-Midland Corporation (Peckar & Abramson, attorneys; Mr. Franklin, on the brief).
Richard F. Ricci, Roseland, argued the cause for respondent (Lowenstein Sandler, attorneys; Cindy D. Salvo, on the brief).
Before Judges STERN, COBURN and COLLESTER.
*456 The opinion of the court was delivered by COBURN, J.A.D.
In this breach of contract case, we were asked to review pretrial orders of a Law Division judge denying discovery of documents that he found were protected by the attorney-client privilege, the work-product rule, or both. We granted appellants' separate motions for leave to appeal, which we now consolidate for purposes of this opinion. Our primary conclusion is that the documents must be disclosed as a sanction for attorney misconduct.
The Law Division judge failed to find the facts, which was contrary to his obligation under the law governing in camera review of allegedly privileged documents, Payton v. New Jersey Turnpike, 148 N.J. 524, 550, 691 A.2d 321 (1997), and contrary to our temporary remand for that specific purpose. However, the parties have urged that we definitively resolve their discovery dispute based on the record. Since an "appellate court may exercise such original jurisdiction as is necessary to the complete determination of any matter on review," R. 2:10-5, and since that course is pragmatic in these circumstances, we will proceed. Our statement of facts is based on the pleadings, certifications, and documents.

I
This action arose from a July 18, 1997, public works contract for the renovation of Bradley Hall, a building owned by defendant Rutgers, the State University ("Rutgers"). Plaintiff, Seacoast Builders Corporation *458 ("Seacoast"), a general contractor, was the successful bidder. The initial contract price was $5,712,600, and the work was to be substantially completed by October 21, 1998. After that date, Seacoast was liable for $3,000 a day in liquidated damages until substantial completion of the project. Approved change-orders increased the price to $6,183,530.28, and Rutgers has paid all but $542,014.96 of that sum.
At the beginning of the project, Rutgers retained an entity called either Lehrer McGovern Bovis, Bovis Lend Lease, Inc., or Bovis Construction Corp. ("Bovis") to serve as its "Owner's Representative." Bovis's duties included review and evaluation of "claims for additional compensation submitted to Rutgers by Seacoast." After reviewing these claims, or proposed change-orders, Bovis would advise Rutgers or Seacoast, or both, usually by letter, explaining why Bovis was recommending that the claim be approved or denied in whole or in part.
After getting Rutgers' approval for a modification of the specifications, Seacoast entered into a subcontract with defendant Smith-Midland Corporation ("SMC"). SMC was to manufacture and supply a "Slenderwall Panel System" to cover the building's existing exterior. Seacoast entered into another subcontract for demolition of the building's existing windows and their replacement with Efco windows. Seacoast alleged that Rutgers delayed completion of the project by repeatedly rejecting proposals for the Efco windows before finally accepting them, and increased the cost of the windows by insisting on a custom design.
By August 1998, Rutgers became convinced that Seacoast would not complete the contract on time, giving rise to a possibly substantial liquidated damages claim, and that disputes were likely to arise with respect to the SMC contract and the Efco windows. Believing that litigation was likely, Rutgers retained Lowenstein Sandler PC ("Lowenstein"). In or about October 1999, Lowenstein asked Bovis "to prepare a number of documents to assist Rutgers and its attorneys in analyzing the claims and preparing for the incipient litigation." The record, however, does not contain any Lowenstein request for the preparation by Bovis of any particular document.
On or around November 4, 1999, Seacoast sent Rutgers a change-order for about $2.6 million in relation to the SMC Slenderwall Panel System and the Efco windows. That change-order is the main element of Seacoast's claim against Rutgers. As had been the practice from the beginning of the project, Bovis was asked for its recommendation. That request resulted in the creation of three documents that are a major focus of the dispute.
Before discussing those documents, five individuals must be identified: Robert Pasqual is a vice-president of Bovis who certified that he served as the "Project Executive" for the Bradley Hall renovation contract; Alex Andrews is Rutgers' Director of Facilities Construction Management; Vernie R. Coston is Rutgers' "Assistant Vice President for Facilities Project Administration," and was responsible for supervising the Seacoast contract; Bill Chipps, another Rutgers administrator, was also involved in supervising this construction project; and Peter J. Witt was a Bovis employee who, according to his letters, was this job's "Project Manager."
On November 18, 1999, Pasqual sent a "Fax" to Andrews enclosing a draft letter, dated November 17, 1999. This two-page letter was addressed to Seacoast and was, in final form, to be signed by Coston. The letter denied Seacoast's proposed *459 change-order; however, it was never sent to Seacoast. On January 5, 2000, Coston wrote a five-page letter to Seacoast, based in part on the Pasqual draft letter, denying the change-order.
In the meantime, by letter dated November 24, 1999, Witt wrote to Coston recommending payment of a portion of the change-order in the amount of $600,000. Because this letter is the primary focus of the discovery dispute, and because it was submitted to Seacoast as part of Rutgers' document production, however inadvertently, we reproduce it in full, while noting that in accordance with the parties' approach, we will refer to it as the Witt Letter:
November 24, 1999
Mr. Vern Coston
Rutgers University
Building # 4116
Livingston Campus
P.O. Box 5076
New Brunswick, NJ XXXXX-XXXX
RE: Bovis Review of Seacoast Builders
 Claim Dated August 1999
 Bradley Hall and Chiller Plant Renovations
 Rutgers University
 Newark Campus
Dear Mr. Coston,
Thank you once again on meeting with me on the above referenced claim.
As stated Bovis Construction is viewing this as a contractor who would have been bidding this work. The documents presently show all the attachments anchored with a sleeve anchor to the existing structure. It is our opinion that any contractor would have assumed that the structure is in reasonably good condition and that the areas that are being fastened to are anchored to a solid material. In order to win this public bid project these assumptions would have been made and would have been assumed based upon the existing conditions and the contract documents at the time of the bid. Remember this is public bidding, low bid wins the contract.
Though the specifications clearly state that the low bidder is required to survey and test the building, this cannot be done until the contract is awarded. I have never heard of a contractor surveying or testing a building prior to a bid. All survey and test information completed by the Architect and Engineer should have been included in the contract documents and they were not. The complete responsibility was passed on to the bidder.
We believe Seacoast Builders subcontractor Smith Midland assumed that the building was in reasonably good condition and their design and costs were based on that. Being on site for over a year I know first hand that the building in (sic) not in good shape, particularly the top portion of the windows, all the parapits (sic), the existing slab edge and the spandrel areas below the window openings which would have been a problem with the original EIFS system or any other system used.
Listed below are the items that Bovis Construction believes Rutgers The State University should consider as realistic costs to the project.
1. Additional anchoring costs
2. Additional equipment costs. (Based on 4 month period)
3. Additional general condition costs. (Based on 4 month period)
These costs were included in the claim and have been reviewed and adjusted accordingly by Bovis Construction (See attached Claim Review). All other portions of the claim we believe should be denied as noted in our claim review.

*460 In addition the window claim that was submitted late in 1998 in (sic) viewed in our opinion as follows. From our research of the past history of this item EFCO was brought in by Grad Associates and Bovis Construction and asked if they could provide a window within a certain budget amount and match the design intent as indicated on the contract drawings prior to bid. At that meeting they noted they could meet the budget as required and Grad Associates revised the specifications to include "EFCO as the basis for design". (sic) If they were, why did it take 4 submissions to approve the shop drawings? Also the window that they said was the design that they included in their bid (2nd Submission), would have met all design requirements as indicated in the specifications. Bovis also notes that there were definite changes between the 2nd submission and the window presently installed on site. Though Seacoast Builders has not provided die cost back up and authorization to proceed with these changes since cost was involved Bovis believes that consideration of these costs should be considered. This is due to EFCO being the basis of design as noted in the specifications. The changes that occurred during the shop drawing process should have never taken place.
Listed are the costs for each that should be considered.
1. Additional anchoring costs: $515,000.00 Based on verified time occurred.
2. Additional storage costs for windows: $30,000.00 Due to delay in anchor installation.
3. Additional costs for window design: $55,000.00 Die costs only.

__________________________
Total Cost $600,000.00

When having your discussions with Seacoast, the following issues are not completed and need to brought (sic) into the conversation.
1. Cleaning and patching of the precast panels.
2. Inspection and repair of all windows by EFCO.
3. Completion of all precast returns at exterior door frames.
4. All sitework as required bt (sic) the contract documents.
We hope that this analysis will be a benefit in your decision making process and if you need further assistance please do not hesitate to call.
Sincerely,
Bovis Construction Corp.
Peter J. Witt
Project Manager
C: Bob PasqualBovis Construction Corp.
Bill ChippsRutgers University
AttachmentBovis Construction Corp. review of claim3 pages.
Privileged Information
Prepared by the request of legal council (sic) for possible future litigation.
On February 15, 2000, Seacoast sued Rutgers for breach of contract, based primarily, as we have noted, on its denial of the $2.6 million change-order, which Seacoast said resulted largely from Rutgers' failure to provide accurate pre-bid information about the building's structural integrity and its handling of the window dispute. Rutgers filed an answer, defending its refusal to pay the change-order; and a counterclaim, demanding $1,215,000 in liquidated damages based on Seacoast's delay in finishing the work in a timely manner. Seacoast also sued SMC for breach of the subcontract.
*461 The withheld documents come from the files of Rutgers and from the separate files of Bovis. The progress of discovery has been limited: Rutgers answered Seacoast's interrogatories and provided what Lowenstein considered to be non-privileged documents; Bovis supplied what Lowenstein considered to be Bovis's non-privileged documents. The proceedings in the Law Division focused exclusively on the documents claimed by Lowenstein to be privileged.
On May 11, 2000, Seacoast's attorney, Duane Morris LLP ("Duane"), served Lowenstein with a request for production of the Rutgers documents pursuant to Rule 4:18, and issued a subpoena duces tecum to Bovis demanding that it produce its documents at Duane's office on May 26, 2000. Duane failed to give Lowenstein notice of that subpoena. However, on May 25, 2000, Lowenstein learned about it from Bovis, and later that day the attorneys agreed that the subpoena would not be enforced according to its terms. Lowenstein wrote to Duane on May 25, confirming their understanding and stating this: "As soon as you provide us with a copy of the subpoena, we will ascertain the volume of documents that are potentially responsive and propose a schedule for the orderly production of the documents." On that same date, Duane wrote to Bovis's attorney, with a copy to Lowenstein, confirming a conversation which indicated that the document production would be rescheduled, probably for some time in early June, and that "[i]n the interim, you agree that Bovis will retain possession of the original documents."
Without notice to Duane or Bovis's attorney, and despite the agreements reached in the May 25, 2000, letters described above, Lowenstein determined that it would both review the Bovis documents and remove those items it considered protected by either the attorney-client privilege or the work-product rule. Lowenstein later certified that it followed that course because it "knew that Bovis had created a number of documents at [Lowenstein's direction] in anticipation of the instant litigation." On an unspecified date, before August 23, 2000, Bovis sent copies of what it believed to be all its documents to Duane.
On July 11, 2000, Lowenstein wrote to Duane confirming their agreement that the Rutgers documents would be available for inspection at Lowenstein's office, and during the week of August 14, 2000, Duane inspected those documents, making copies of some of them.
On August 23, 2000, Duane wrote two letters, one to Lowenstein and the other to Bovis's attorney. In both letters, Duane asked whether any documents had been withheld. Bovis's attorney responded in a letter of August 30, 2000, copied to Lowenstein, stating that he was unaware that Lowenstein had removed any of Bovis's documents on the grounds of privilege and asking Lowenstein if that had occurred. There is no evidence that Lowenstein responded to the Bovis letter; however, on August 30, 2000, Lowenstein wrote to Duane, stating among other things: "Privilege logs prepared on behalf of Rutgers and Bovis should be completed no later than Wednesday, September 13, 2000." (Emphasis added).
That letter was not included in the record by either party before argument of this appeal. During argument, Lowenstein mentioned its existence in response to Duane's claim that it did not become aware that Bovis's documents had been removed by Lowenstein until July 2001. The parties agreed that we could consider Lowenstein's letter as part of the record, and it was formally submitted thereafter along with a number of other letters which *462 were also not part of the initial record. In a certification submitted after argument, Duane acknowledged its receipt of the letter, but asserted that the letter "did not alert Seacoast that Rutgers had removed documents from the Bovis production, nor does it respond to Bovis's inquiry on this matter." The certification went on to state this: "Given that Rutgers was responding to Seacoast's letter about the Rutgers production and privilege log, Seacoast did not catch Rutgers' inclusion of [the] word `Bovis' in its letter. Seacoast was still waiting for Rutgers to respond to Bovis's counsel's request that Rutgers tell him whether Rutgers removed documents. Rutgers never responded to Bovis's letter."
Despite its assurance that privilege logs would be provided by September 13, 2000, Lowenstein did not transmit the logs until July 25, 2001. According to Duane, this occurred after it found the Witt Letter in the Rutgers documents in June 2001, and then inquired of Lowenstein, without informing that firm that it had the letter, whether any documents had been withheld.
On September 12, 2001, Lowenstein sent revised privilege logs indicating that it was withholding thirty Bovis documents, including the Witt Letter, and thirty-four Rutgers documents. The privilege logs list each document under headings entitled: "DATE, RECIPIENT, CC'S, AUTHOR, DESCRIPTION [and] PRIVILEGE [asserted]." The persons are not identified other than by name, the descriptions are extremely limited, and the privilege asserted is indicated by simply stating, without explanation, either "attorney-client," "work-product," or both.
At some point, unstated in the record, Rutgers answered interrogatories. One answer included this statement: "Subject to and without waiver of the foregoing objections, Rutgers refers plaintiff to the relevant, non-privileged portions of the documents produced by Rutgers to plaintiff, and the documents produced pursuant to subpoena by Bovis...." (Emphasis added).
In September 2001, Duane filed a motion to strike Rutgers' pleadings for failure to provide documents. The judge denied the motion on the papers by an order filed on September 28, 2001, indicating that Duane should move for more specific answers. On December 5, 2001, Duane filed a motion to compel production of the documents, supported by a certification reciting the history of discovery in the case and analyzing the privilege logs, copies of which it submitted to the judge. The judge entered an order directing Lowenstein to submit the documents for in camera review together with the privilege logs. SMC's attorney, Peckar & Abramson ("Peckar"), supported Duane's motion.
Lowenstein responded to the judge's order by submitting the documents, accompanied, not by the privilege logs sent to Duane and Peckar, but by two documents, one entitled "DESCRIPTION OF RUTGERS PRIVILEGED DOCUMENTS SUBMITTED TO [the judge] FOR IN CAMERA REVIEW," and the other entitled "DESCRIPTION OF BOVIS PRIVILEGED DOCUMENTS SUBMITTED TO [the judge] FOR IN CAMERA REVIEW." Those documents contain no indication of the specific privilege relied upon; however, they do provide more detailed descriptions of the documents. Lowenstein intentionally failed to send Duane or Peckar copies of the descriptions, referred to by the parties, and now us, as the "Document Descriptions;" nor did Lowenstein indicate to the opposing law firms that the Documents Descriptions had been created and submitted to the judge. According to Lowenstein's brief, a *463 day after the Document Descriptions were given to the judge, it delivered to him copies of the privilege logs previously served on Duane and Peckar.
Apart from the Document Descriptions, Lowenstein supported its resistance to the discovery motion by a letter-brief dated December 18, 2001, which we quote in pertinent part:
While Rutgers does not dispute the fact that the preparation of letters of evaluation with respect to Seacoast's Proposed Change Orders ("the Recommendation Letters") was one of Bovis's duties as Rutgers' Owner's Representative for the Project, it vehemently denies the allegation that no such documents were produced by Bovis or Rutgers. Indeed, Recommendation Letters in response to Seacoast's approximately 200 Proposed Change Orders can be liberally found throughout both document productions.
....
Also unfounded is Smith-Midland's (and Seacoast's) assertion that neither Bovis nor Rutgers produced a Recommendation Letter with respect to the $2.6 million Proposed Change Order (the "Request for Equitable Adjustment") which is a key issue in this litigation. In truth, Rutgers and Bovis each produced a detailed document which explained why the Request for Equitable Adjustment was being rejected. Attached hereto ... is a five-page letter, dated January 5, 2000, from Rutgers to Seacoast, exploring in detail why the Request was being rejected. In addition, attached hereto ... is a November 17, 1999 draft letter by Bovis, which had never been finalized, explaining why it was recommending to Rutgers that the Request be rejected. Rutgers produced both these documents without any claim of privilege.
....
Counsel for Seacoast and Smith-Midland, however, are with this motion, apparently hoping to make their lives easier by asking this court to provide them, on a silver platter, the extensive analysis of this case prepared by Bovis at Lowenstein's specific request....
The simple truth is: Seacoast and Smith-Midland are not entitled to production of the Bovis Privileged Documents. These documents were not created in Bovis's "ordinary course of business" as Rutgers' Owner's Representative. They do not analyze Proposed Change Orders and the reasons for rejecting or accepting them; rather, they analyze the history of the Project. These documents would not exist BUT FOR Lowenstein's specific request to prepare them.

[Emphasis added.]
That letter was written before Lowenstein knew that Duane and Peckar were already in possession of the Witt Letter.
By letter dated January 30, 2002, the judge advised counsel that the in camera review had been completed, stating among other things, "I have also highlighted the description of the documents I found privileged in the 3 or 4 page document descriptions at the beginning of each volume." On February 11, 2002, Duane wrote to Lowenstein, demanding copies of the Document Descriptions, noting it had been unaware that Lowenstein had submitted anything to the judge other than the privileged documents and their logs, and asserting that Lowenstein's conduct in that regard was improper ex parte communication with the judge. Duane also wrote to the judge, asking for an order requiring turnover of the Documents Descriptions.
By letter dated February 14, 2002, Lowenstein responded to Duane, with a copy to the judge, stating in part:
*464 I have not enclosed the "3 or 4 page document descriptions" (the "Document Descriptions") which we submitted to [the judge] along with the privileged documents.... [The judge] has not ordered us to produce the Document Descriptions; and ... I disagree with the characterization in your letter, of the Document Descriptions as "ex parte communications" that must be sent to counsel. In actuality, the Document descriptions were simply a part of our in camera submission. They describe the documents in more detail than is appropriate in a privilege log; therefore, along with the enclosed non-privileged documents, I am also enclosing redacted Document Descriptions that reveal the descriptions of only the non-privileged documents.
On February 14, 2002, the judge entered an order requiring Rutgers to produce only the non-privileged documents and, at Duane's request and over Lowenstein's objection, the Document Descriptions. In a letter dated February 19, 2002, the judge explained his ruling to counsel as follows:
I see nothing improper in the descriptions of the documents the Lowenstein firm sent to me. They are really nothing more than privilege logs telling me what I was looking at and what privilege was being claimed. Indeed, I used them before receiving under separate cover some additional pages designated "privilege logs". I have ordered [the Lowenstein firm] to provide copies of same to counsel indicating what I marked off and what I did not, in order that counsel will have a record of what I looked at and what I ordered to be produced. I ordered their dissemination in the form contained in the Order simply because they are what I utilized in deciding what to order be produced and what I deemed privileged.
That letter contained no findings of fact or conclusions of law. The accompanying order, dated February 14, 2002, states:
Rutgers ... shall produce to Seacoast... and all other parties all documents as described in the letter [of the trial court], dated January 30, 2002, within 20 days of the date of this Order, together with copies of the two 3 to 4 page descriptions of the documents as marked by this Court, designating what the Court highlighted.
After finally receiving the Document Descriptions, Duane, joined by Peckar, moved for reconsideration, revealing for the first time their possession of the Witt Letter, which they contended was inconsistent with the representations in Lowenstein's December 18, 2001, letter-brief quoted above.
Lowenstein cross-moved, seeking return of the Witt Letter and a declaration that it could not be used in the litigation. In support of its position, Lowenstein filed three certifications. The certification of Coston stated in part that Witt was only a "junior project manager at Bovis...." It added, "The Witt letter was, apparently, written in response to a request by Lowenstein counsel, John Clark[,] to analyze Seacoast's potential claims in the anticipated litigation." It also said, "Pasqual, Witt's superior, subsequently informed me that the Witt Letter did not accurately reflect Bovis's views with respect to the Proposed Change Order." Pasqual's certification included these statements: (1) "In or about October 1999, an attorney from Lowenstein Sandler, John Clark, asked Bovis to prepare a number of documents to assist Rutgers and its attorneys in analyzing Seacoast's potential claims and preparing for the incipient litigation"; (2) "On or about November 24, 1999, Peter Witt, a junior project manager at Bovis ... sent a letter (the `Witt Letter') to Rutgers regarding *465 the Project. The Witt Letter was one of the documents written in response to Clark's request in anticipation of litigation"; and (3) "The Witt Letter did not represent Bovis's recommendation regarding the Proposed Change Order. I engaged in many telephone conversations and meetings where I informed Rutgers and Lowenstein that Bovis's recommendation was that the Proposed Change Order not be paid." The certification of John E. Clark, an associate at Lowenstein, included these statements: "In or about October 1999, I asked ... [Bovis] to prepare a number of documents to assist Rutgers and its attorneys in analyzing the claims and preparing for the incipient litigation. Bovis did so, and stamped most of these documents `Privalaged (sic) Information, Prepared by the request of legal council (sic) for possible future litigation.'"
The judge entered two orders on March 22, 2002: The first order denied appellants' motion for reconsideration with respect to (1) "documents as identified in the Description of Bovis Privileged Documents Submitted to [the judge] For In Camera Review," and lists those documents as numbers 2, 4 through 8, 10 through 15, 17, 19, 21, 25, and 28; and (2) "documents as identified in the Description of Rutgers Privileged Documents Submitted to [the trial court] For In Camera Review," and lists those documents as numbers 12, 19, 20, and 23. This order also denied Duane's request for attorneys' fees for the initial motion to compel as well as the motion for reconsideration. The other order, from which no appeal was taken, denied Lowenstein's requests for return of copies of the Witt Letter and a declaration that the "Witt Letter is privileged and cannot be used in the instant litigation."
On July 10, 2002, we granted appellants leave to appeal from the order of February 14, 2002, and the first order filed on March 22, 2002. While retaining jurisdiction, we remanded the case to the judge with the following instructions:
The matter is remanded with direction that defendant shall resubmit the documents in question to the trial court. The trial court shall ... make specific findings as to the discoverability of each document, stating with specificity the bases upon which it determines that the documents are privileged. The trial court's findings shall be submitted to the clerk of the Appellate Division within sixty days.
Upon submission of the trial court's findings, defendant shall submit to the clerk, under seal, the documents in question with an appropriate log.
Jurisdiction is retained.
The judge responded to our order by an August 30, 2002, letter stating that he was enclosing lists of the privileged documents and the reasons for his determinations. The lists consisted of brief descriptions of each privileged document, descriptions which were so brief that the only information they conveyed was which document was at issue, and the phrases "attorney-client" or "work product" or both after each description.
Despite our direction that Lowenstein submit the privileged documents to us, that portion of our order was ignored. Shortly before argument, we discovered that we were missing the documents, and directed Lowenstein to submit them forthwith, which was done. In its post-argument submission, Lowenstein certified that although it had received our two-page order, the attorney handling this aspect of the case only received the first page and was unaware of the direction on the second page that Lowenstein submit the privileged documents to us under seal.

*466 II
Before turning to analysis of the specific contentions, we take note of the basic principles governing assertions of privilege in the context of document discovery. Our discovery rules must "be construed liberally in favor of broad pretrial discovery." Payton, supra, 148 N.J. at 535, 691 A.2d 321. Relevant documents are presumptively discoverable, but can be withheld by a demonstration of privilege. Id. at 539, 691 A.2d 321. However, the "need for secrecy must be demonstrated with specificity as to each document. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, are insufficient." Id. at 559, 691 A.2d 321 (quoting Hammock by Hammock v. Hoffmann-LaRoche, Inc., 142 N.J. 356, 381-82, 662 A.2d 546 (1995)). The one seeking "to overcome the strong presumption of access must establish by a preponderance of the evidence that the interest in secrecy outweighs the presumption." Hammock, 142 N.J. at 381, 662 A.2d 546; see also Horon Holding Corp. v. McKenzie, 341 N.J.Super. 117, 125, 775 A.2d 111 (App.Div.2001).
When documents are requested under Rule 4:18-1, a written response is due in thirty-five days, and it "shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for objection shall be stated." R. 4:18-1(b) (emphasis added). More specific guidance is provided for documents thought to be privileged, or protected as work product, by Rule 4:10-2(e), which reads:
When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.
Rule 4:10-2(e) follows verbatim the federal rule, Fed.R.Civ.P. 26(b)(5). Under the latter, the party asserting the privilege must provide the reviewing court with, among other things, "a specific explanation of why each document is privileged or immune from discovery [which] must include a comprehensive presentation of all factual grounds and legal analyses in a non-conclusory fashion." Pippenger v. Gruppe, 883 F.Supp. 1201, 1212 (S.D.Ind. 1994) (citation omitted); see also Burns v. Imagine Films Entertainment, Inc., 164 F.R.D. 589, 593 (W.D.N.Y.1996) (stating that the privilege log should explain, in addition to identifying the privilege asserted, "how each element of the privilege is met as to that document").
When a New Jersey trial court reviews documents in camera, it must "`make specific determinations regarding plaintiff's access to them, including an expression of reasons for the court's rulings.' " Payton, 148 N.J. at 550, 691 A.2d 321 (quoting the Appellate Division's opinion in Payton, 292 N.J.Super. 36, 52-53, 678 A.2d 279 (App.Div.1996)). The trial court must examine each document individually, and explain as to each document deemed privileged why it has so ruled. Id. at 524, 691 A.2d 321. See also Franklin v. Milner, 150 N.J.Super. 456, 375 A.2d 1244 (App.Div.1977), which provides an informative example of the kind of detailed analysis that is required before a document is withheld as privileged.
Among the important public polices served by compliance with the time limits in our rules is the expeditious resolution *467 of cases. Zaccardi v. Becker, 88 N.J. 245, 252, 440 A.2d 1329 (1982). The imposition of sanctions to enforce the rules is both explicit, see, e.g., Rule 4:23, and inherent in the judicial power, Lang v. Morgan's Home Equip. Corp., 6 N.J. 333, 338-39, 78 A.2d 705 (1951). Moreover, the imposition of sanctions is "peculiarly necessary in matters of discovery." Id. at 338, 78 A.2d 705. With those principles in mind, we return to the circumstances of this case.

III
Appellants contend that all of the documents deemed privileged by the Law Division judge should be turned over to them because of Lowenstein's misconduct. The misconduct is identified by appellants as Lowenstein's "unilateral removal of documents... from the files of a third-party witness, i.e., Bovis, which were already under subpoena," the failure to disclose that act, and the ex parte submission of the Document Descriptions to the judge. Characterizing that conduct as "unethical, inexcusable, and a blatant violation of the spirit of the discovery rules," appellants assert that the proper sanction is an order denying the documents protection from discovery. Appellants also argue that it was only the inadvertent disclosure of the Witt Letter in the Rutgers documents that gave them notice that Lowenstein had secretly reviewed the Bovis documents and had removed those it thought privileged before Bovis complied with the subpoena. And they emphasize, as well, that the privilege logs were only produced after they asked for the second time whether any documents had been withheld.
We begin our analysis of those contentions by noting a fact omitted from the briefs submitted by appellants, namely that the subpoena duces tecum, which appellants' improperly failed to include in their appendix, see R. 2:6-1(a)(1), was issued by Duane in a manner contrary to our court rules, which require simultaneous service of the subpoena "on all parties." R. 4:14-7(c). Moreover, Duane never enforced the subpoena. Instead of having a Bovis witness appear to attest to the documents, Duane agreed with Lowenstein, which had been informed of the subpoena by Bovis, to have Bovis transmit the documents. The agreement is reflected in the May 25, 2000, letters. Lowenstein's letter provided some indication that it intended to review the documents before they were turned over, by saying that it would "ascertain the volume of documents that are potentially responsive and propose a schedule for the orderly productions of the documents." On the other hand, Duane's letter, to which Lowenstein raised no objection, clearly stated that Bovis would "retain possession of the original documents." The parties definitely did not agree that Lowenstein could remove documents during an ex parte review.
Since, by agreement, the documents were never formally produced pursuant to the subpoena, the charge that Lowenstein interfered with the subpoena is technically insupportable. In essence, the parties' agreement implicitly converted the subpoena into a document production demand under Rule 4:18-1 and Rule 4:10-2(e). But production of the documents under those rules placed on Lowenstein the duty of stating the reasons for its objections to the production of any documents when the documents were delivered or otherwise reviewed by Duane. Lowenstein's failure to follow that course, particularly while failing to notify either Bovis or Duane that it had removed documents, violated the terms and spirit of the rules. Lowenstein also violated Rule 4:18-1(b) when it permitted Duane's inspection of the Rutgers documents in its office during the week of *468 August 13, 2000, without notifying Duane that some documents had been removed on the grounds of privilege.
Lowenstein argues that the interrogatory answer quoted above gave Duane adequate and timely notice that it was withholding Rutgers and Bovis documents, but that argument lacks merit. First, there is no indication in the record as to when the interrogatories were answered. Second, the interrogatory answer refers Duane to "non-privileged portions of" Rutgers' documents. That is not a statement that documents have been withheld, it is merely an indication that portions of the documents submitted have been deleted as privileged. Third, the statement respecting Bovis's documents contains no indication that any documents were deemed privileged; in fact, and particularly in relation to the description of the Rutgers documents, it implies that all of the Bovis documents had been turned over.
On the other hand, appellants' claim, that they learned about the withholding of Bovis's documents only because of their discovery of the Witt Letter in July 2001, is contrary to the record, which suggests, at the least, that Duane became aware of the Witt Letter during the August 2000, inspection of the Rutgers documents.[2] That would certainly provide a reasonable explanation for Duane's August 23, 2000, letters asking if any documents had been withheld. In any case, Lowenstein's August 30, 2000, letter, which appellants unjustifiably omitted from their appendix, implicitly admitted the withholding when it stated, "Privilege logs prepared on behalf of Rutgers and Bovis should be completed no later than Wednesday, September 13, 2000." Even if we accept Duane's assertion that it did not notice the reference to Bovis when it received the letter, there can be no question that when the August 30, 2000, letter was sent, Lowenstein was unaware that it had inadvertently disclosed the Witt Letter to its adversary. Moreover, it was still unaware of that fact when it served the privilege logs on appellants on July 25, 2001, and the Witt Letter is listed in those logs. Thus, it seems apparent that Lowenstein never formed the intent to withhold the existence of the Witt Letter from appellants if it served privilege logs. But the record contains inadequate assurance that Lowenstein would ever have served the logs if Duane had not inquired again, almost a year later in July 2001, as to whether any documents had been withheld. Furthermore, Lowenstein's year-long delay in serving the logs substantially interfered with the timely completion of discovery.
Lowenstein attempts to justify its ex parte submission of the Document Descriptions to the judge by stating that they "were only slightly more detailed than a traditional privilege log" and "contained no advocacy whatsoever." Actually both the logs and the Document Descriptions contain less information than many courts require with respect to privilege logs and less information than is demanded by Rule 4:10-2(e), but they do not suffer from the inclusion of advocacy. Nonetheless, there was of course no justification for their ex parte submission since they contained precisely the information to which appellants were entitled under Rule 4:10-2(e). The *469 only ex parte submission permitted under that rule is that of the allegedly privileged documents.
Lowenstein argues that the ex parte submission did no harm because appellants were able to address their contents on the motion for reconsideration. However, as appellants note, by then the judge had made his decisions, which he said were based on the Document Descriptions, and had returned the documents, thus placing appellants in a disadvantageous position. That is not to suggest that appellants would not have moved for reconsideration anyway. Indeed, it appears highly likely that appellants would have so moved because of their desire to use the Witt Letter, their possession of which they revealed for the first time only after the judge's initial ruling.
We turn to another aspect of Lowenstein's conduct of which appellants complain; namely, a portion of Lowenstein's December 18, 2001, letter-brief, which was submitted in resistance to appellants' discovery motion. In that letter, Lowenstein represented that the Bovis documents "do not analyze Proposed Change Orders and the reasons for rejecting them; rather, they analyze the history of the Project." That is not a fair description of the Witt Letter. Furthermore, the Witt Letter refers to the "attached Claim Review," which Lowenstein also withheld. Moreover, Lowenstein's statement ("These documents would not exist BUT FOR Lowenstein's specific request to prepare them"), is at least an exaggeration. The record contains inadequate evidence of a "specific" request for any document. And the Witt Letter, which is neither addressed nor copied to any attorney, states that its purpose is to help Coston in reaching a decision on the change-order.
Lowenstein's failure to submit the privileged documents to us, until we directed it to do so just before argument, also deserves comment. Our order granting leave to appeal required that course. According to Lowenstein, the attorney assigned to the case only received the first page of the order and was unaware of the direction in question, which appeared on the second page. But only the second page was signed. Thus, the first page, standing alone, was not an order, and the attorney should have recognized that. Moreover, even without the order, it should have been obvious that the privilege documents had to be submitted to us under seal since they are "essential to the proper consideration of the issues," R. 2:6-1(a)(1), and they could only be submitted by Lowenstein since only Lowenstein had them.
During oral argument we questioned Rutgers' entitlement to a favorable ruling on the bulk of the documents because of its failure to include in its briefs any arguments addressed to the question of whether or not each of those documents was privileged, with the exception of the Witt Letter. The parties were permitted an opportunity to file supplemental briefs, which they did. Rutgers asserted in its brief that the arguments it "advanced with respect to the Witt Letter apply equally to the bulk of the other Bovis Documents...." It added,
Because these "other" Bovis documents, like the Witt Letter, were prepared to assist Rutgers and Lowenstein in preparing for the instant litigation by analyzing the potential claims, Rutgers believed that it was unnecessary and duplicative to craft a particularized argument with respect to each of the Bovis documents.
The only reason given in its appellate briefs for non-discovery of the Bovis documents was the work-product rule.
*470 Rutgers' position in this regard is insupportable. It was obliged to provide "a specific explanation of why each document is privileged or immune from discovery [which] must include a comprehensive presentation of all factual grounds and legal analyses in a non-conclusory fashion." Pippenger v. Gruppe, supra, 883 F.Supp. at 1212. That obligation is implicit in our Supreme Court's holding that a trial court must examine each document individually, and explain as to each document deemed privileged why it has so ruled. Payton, supra, 148 N.J. at 550, 691 A.2d 321. If the court is obliged to follow that course, it is obviously entitled to a factual presentation and legal argument to support the claim as to each document. That obligation was not met in this case.
In a variety of settings, courts have refused to honor claims of privilege when there have been failures to abide by the discovery rules or attorney misconduct. See, e.g., In re Grand Jury Subpoena, 274 F.3d 563, 575-76 (1st Cir.2001); Dorf & Stanton Communications, Inc. v. Molson Breweries, 100 F.3d 919, 923 (Fed.Cir. 1996), cert. denied, 520 U.S. 1275, 117 S.Ct. 2455, 138 L.Ed.2d 213 (1997); Chase Manhattan Bank, N.A., v. Turner & Newall, PLC, 964 F.2d 159, 165 (2d Cir.1992); Parrott v. Wilson, 707 F.2d 1262, 1270-72 (11th Cir.), cert. denied, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); Moody v. I.R.S., 654 F.2d 795, 799-801 (D.C.Cir. 1981); Pippenger, supra, 883 F.Supp. at 1211-12; Smith v. Conway, Org. Inc., 154 F.R.D. 73, 75 (S.D.N.Y.1994); Strougo v. BEA Assoc., 199 F.R.D. 515, 520-21 (S.D.N.Y.2001); Omega Consulting Group, Inc. v. Templeton, 805 So.2d 1058 (Fla. Dist.Ct.App.2002); and TIG Ins. Corp. of America v. Johnson, 799 So.2d 339 (Fla. Dist.Ct.App.2001), review denied, 821 So.2d 304 (2002). None of those cases contain facts as egregious as those presented here. However, as the court noted in Moody, in this context "each case obviously presents new permutations and combinations of fact patterns, all of which must be taken into account when reaching a decision." 654 F.2d at 801.
Here, to summarize, we are confronted with the following circumstances. A party's attorney, after documents have been demanded, (1) removes documents from the files of a non-party witness, and does so without even advising the non-party of its action, thereby leading that non-party into believing it is presenting all its documents; (2) withholds documents without notice and after agreeing not to do so; (3) ultimately provides notice over a year late and only after being twice asked if documents have been withheld; (4) permits documents to be discovered without noticing the other side that documents have been withdrawn; (5) provides an interrogatory answer which implies that no documents have been removed; (6) serves privilege logs which it correctly believes are inadequate, and then "remedies" the situation by submitting supplemental logs to the judge ex parte; (7) files a brief which inaccurately describes the privileged documents; (8) fails to provide adequate factual and legal justification with respect to each document, below or on appeal; and (9) fails to provide the appellate court with the privileged documents under seal until so ordered a second time and despite the fact that the need for the documents is self-evident. Those circumstances are sufficiently egregious, when taken together, to justify a severe sanction.
We acknowledge that there is no express provision in our rules for the sanction sought by appellants. Thus, this sanction could only be imposed under our inherent authority. Lang, supra, 6 N.J. at 338, 78 A.2d 705. As a general matter, the policy of our courts is to impose, not *471 the harshest possible remedy for discovery violations, but a remedy that adequately addresses the problems created without undue prejudice. Abtrax Pharm. Inc. v. Elkins-Sinn, Inc., 139 N.J. 499, 512-17, 655 A.2d 1368 (1995); Brookside Apartments, Inc. v. C.S, 276 N.J.Super. 501, 507-08, 648 A.2d 275 (App.Div.1994). Here, we are satisfied that the extent and nature of Lowenstein's misconduct fully justify the remedial relief sought by appellants, particularly in light of the resulting delay, disadvantage, and inconvenience. Furthermore, the arguments presented against discovery of the Bovis documents are limited to the work-product rule and none of the documents contain the impressions, opinions, conclusions, or legal theories of Rutgers' administrators or its attorneys. Moreover, Bovis was required to supply its opinions on change-orders in the ordinary course of its representation of Rutgers. Jenkins v. Rainner, 69 N.J. 50, 350 A.2d 473 (1976).[3] We emphasize, however, that making the documents available for discovery does not mean they will be admissible at trial. That issue is not before us, and we express no opinion on it.

IV
Although appellants seek discovery of all the Bovis documents and a few Rutgers documents, their briefs are devoted almost entirely to the discoverability of the Witt Letter. For reasons that will appear, that subject deserves separate comment.
As a result of the judge's orders, and lack of findings, the legal status of the Witt Letter is unclear. Although the judge twice ordered it protected as work-product, he also entered a separate order denying Rutgers' request that the letter be returned with a declaration that it could not be used during discovery or in the trial of the case. Rutgers did not appeal from the separate order. Although Rutgers argues that the judge's intent that the document not be used in the litigation may be inferred from the second order declaring it protected work-product, that is not clear to us in light of the separate order denying the specific relief Rutgers sought in this regard. Perhaps, the judge was relying on the line of out-of-state cases which hold that privilege is destroyed by any involuntary disclosure, including a mistaken one, but we have questioned that proposition, at least with respect to the attorney-client privilege. State v. J.G., 261 N.J.Super. 409, 419-20, 619 A.2d 232 (App.Div.), cert. denied, 133 N.J. 436, 627 A.2d 1142 (1993); see also Trilogy Communications, Inc. v. Excom Realty, Inc., 279 N.J.Super. 442, 443, 652 A.2d 1273 (Law Div.1994).
The question here is no longer discoverability but admissibility. In other words, should the Witt Letter be deemed *472 inadmissible, in whole or in part, on the ground that it is work-product, even though it was inadvertently supplied to Seacoast and SMC? Since we cannot determine what the judge intended, and since our remand was unproductive, we will resolve this issue, keeping in mind that Rutgers has the burden of persuading us that the Witt Letter is work-product. Hammock, supra, 142 N.J. at 381, 662 A.2d 546; Horon Holding Corp., supra, 341 N.J.Super. at 125, 775 A.2d 111.
Rutgers' evidence consisted of the document itself and the certifications of Coston, Pasqual, and Clark.
The letter was written about twenty days after Seacoast submitted the $2.6 million change-order. It was addressed to Coston, signed by Witt as "Project Manager" for Bovis, and copies were sent to Chipps and Pasqual, but not to any attorney. With the exception of the last line, the letter appears in all respects to be the kind of recommendation that Bovis had made throughout the project, and the kind of recommendation that Rutgers turned over to Seacoast in discovery as not protected by any privilege or rule. The last two lines contain the only suggestion of privilege with these words: "Privileged Information[/]Prepared by the request of legal council (sic) for possible future litigation."
Coston's certification merely states that the letter was, "apparently, written in response to a request by Lowenstein counsel, John Clark[,] to analyze Seacoast's potential claim in the anticipated litigation." (Emphasis added.) The most likely inference that can be drawn from that statement is that Coston was relying on the last two lines of the letter and had no personal knowledge of any such request by Clark. While Coston attempts to denigrate Witt by calling him a "junior project manager," he does not expressly dispute the statement in the letter indicating that he had met with Witt to discuss the change-order before the letter was written; nor does he comment on the letter's statement that Witt hoped "this analysis will be a benefit in your decision making process...." The decision that had to be made was, of course, whether to pay the change-order, deny it, or offer to pay it in part. Although he also certifies that Pasqual "subsequently informed me" that the Witt Letter did not reflect Bovis's views, that hearsay statement cannot be considered as proof of its truth. Moreover, it is an odd statement considering that by November 18, 1999, Coston had received Pasqual's draft letter recommending that the change-order not be paid. Finally with respect to Coston, we note that he did not certify that he or any Rutgers official had asked Witt to prepare the letter for litigation purposes.
Pasqual's certification states that around October 1999, Lowenstein "asked Bovis to prepare a number of documents to assist Rutgers and its attorneys in analyzing Seacoast's potential claims and preparing for the incipient litigation." He does not otherwise specify the nature of those documents. Although he asserts that the Witt Letter was one of those documents, he provides no facts to support that proposition. Nor does he deny that Witt was generally empowered by Bovis to make recommendations to Rutgers on Seacoast's change-orders. Although he asserts that the Witt Letter did not represent Bovis's recommendation, the letter is signed by Witt on behalf of Bovis. On the other hand, it appears apparent from Pasqual's draft letter of November 17, 1999, which he sent to Coston the next day, that Pasqual had decided to recommend against payment before Witt wrote his letter. However, Pasqual, a recipient of the Witt *473 Letter, raised no objection to its issuance or its contents before Seacoast sued.
Clark's certification adds little to Rutgers' case. Like the others, he describes his request for preparation of documents by Bovis in general terms, and gives no indication that he specifically asked Witt to prepare anything, much less the Witt Letter.
Rutgers made no attempt to secure a certification from Witt, so we have no idea what he would say about all this, and in particular what he would say about the last lines of his letter. Although Witt no longer works for Bovis, there is no indication that he is unavailable as a witness.
Given these circumstances, we are satisfied that Rutgers has failed to prove by a preponderance of the evidence that the Witt Letter was work-product. We reach that conclusion because Rutgers did not ask that Witt prepare the letter for litigation purposes, and there is insufficient evidence that Lowenstein asked for it at all. It may well be that there was confusion at Bovis as to who should respond to the change-order, with Pasqual believing that he would take care of the matter, and Witt believing it was his responsibility as Project Manager. In any case, the result was that Rutgers received, in short order, two conflicting Bovis responses to the change-order. The resulting status of the Witt Letter is unclear. Although Rutgers has not shown that the letter was its or its attorney's work-product, that does not mean the letter is admissible in evidence. All it means is that it may not be kept out of evidence on the ground of privilege. Since the issue has not been briefed, we express no opinion on the general admissibility of the letter at trial, but it may of course be used in discovery.

V
Appellants also seek discovery of five Rutgers documents, Nos. 12, 19, 20, 23, and 24. Unlike the Bovis documents discussed above, these documents are unquestionably covered by the attorney-client privilege or the work-product rule. The first item under number 12, is an e-mail from Rutgers to Lowenstein discussing information provided by Bovis. It is obviously protected by the attorney-client privilege as a communication with counsel in the course of a professional relationship and in confidence, N.J.S.A. 2A:84A-20(1), which also appears as N.J.R.E. 504; however, the Bovis documents attached shall be turned over. Number 19 concerns discussions among Rutgers officials of a possibility of settlement with Seacoast and is obviously protected by the work-product rule. Number 20, a negotiations summary prepared by Bovis, is on its face obviously a document whose sole purpose was to aid Rutgers in the litigation. It, too, without question falls within the protection of the work-product rule. Number 23 is the Witt Letter, which appellants already have. Number 24 is a duplicate of number 12. We have treated the Rutgers documents differently from the Bovis documents in part because protection of the attorney-client privilege is more important than protection of work product, cf. Trilogy Communications, supra, 279 N.J.Super. at 445-47, 652 A.2d 1273, and because the reasons for protection are so obvious on the face of the documents in question.

VI
Seacoast, without citing any law, argues that the judge erred in denying its request for counsel fees incurred in presenting the motions for discovery of the documents. Since the judge made no findings of fact, other than the erroneous finding that the ex parte submission was not improper, we have no idea why he denied Seacoast's motion. In any case, we are *474 not obliged to search for legal authority in support of Seacoast's position, R. 2:6-2(a)(5), and in the circumstances of this case we decline to do so. The circumstances to which we refer include the issuance of the subpoena duces tecum without notice to Lowenstein, the failure to advise Lowenstein of the inadvertent receipt of the Witt Letter on the day it was discovered and in the first two motions for discovery, and the delay in bringing the discovery issues to court.
Affirmed in part; reversed in part.
NOTES
[1] Although no third-party pleadings were included in the record, the appellants' briefs indicate that Skylift Corporation, Mariano D. Molina, P.C., and Mariano D. Molina, P.E., have been impleaded as third-party defendants. They have not participated in this appeal.
[2] Under the Model Rules of Professional Conduct, an attorney who receives in discovery "materials that on their face appear to be subject to the attorney-client privilege, or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them." ABA Comm. on Ethics and Professional Responsibility, Formal Op. 92-368 (1992). Lowenstein has not cited that opinion, but we are inclined to believe that it might have been applicable here.
[3] The Court described the status of the work-product rule in the following manner:

Much of what was traditionally included as non-discoverable "work product" has in recent years been stripped of its absolute protection. So it is that now one is hard put to conceive of any non-privileged relevant material which enjoys an unqualified protection against discovery, that favored status of absolute immunity being reserved for "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." While reaffirming the sacrosanct character of whatever may be included in these latter categories, we hold as well that if the industry of counsel or his investigator results in a piece of concrete evidence, such as the motion picture films in this case, then that evidence is not rendered non-discoverable solely because of the "work product" doctrine. If it be non-discoverable despite its relevancy and the absence of privilege, it must be by reason of some exception provided for by our discovery Rules.
[Id. at 54-55, 350 A.2d 473 (citations omitted).]