917 A.2d 286 (2007)
391 N.J. Super. 129
David RIVARD, as Administrator of the Estate of Lindsay M. Rivard, Deceased, and David Rivard and Diane Rivard, as the Parents and Natural Guardians of Lindsay M. Rivard, Deceased, Plaintiffs-Respondents,
v.
AMERICAN HOME PRODUCTS, INC., American Cyanamid Company and Lederle Laboratories, a Division of American Cyanamid, Defendants-Appellants (Two Cases).
Superior Court of New Jersey, Appellate Division.
Argued December 20, 2006.
Decided March 8, 2007.
*291 Roger W. Yoerges, of the District of Columbia bar, admitted pro hac vice, argued the cause for appellants (Porzio, Bromberg & Newman, Morristown, and Mr. Yoerges, attorneys; Kenneth R. Meyer, Morristown, of counsel; Mr. Yoerges, on the brief).
Donald S. MacLachlan, and Stanley P. Kops, of the Pennsylvania bar, admitted pro hac vice, Bala Cymwyd, PA, argued the cause for respondents (Breslin & Breslin, Hackensack, Mr. MacLachlan, and Mr. Kops, attorneys; Angelo A. Bello, Hackensack, of counsel; Mr. Bello and Mr. Kops, on the brief).
Edward Himmelfarb, Washington, DC and Elizabeth H. Saindon, Rockville, MD, argued the cause for amicus curiae, United States of America (Christopher J. Christie, United States Attorney, attorney; Neil R. Gallagher, Assistant United States Attorney, on the brief).
Before Judges LEFELT, PARRILLO and SAPP-PETERSON.
The opinion of the court was delivered by
LEFELT, P.J.A.D.
Lindsay Rivard ingested an oral polio vaccine called Orimune from which she allegedly developed a brain tumor and died at seven years of age. Plaintiffs David Rivard, as administrator of the estate of his deceased daughter; and David and his wife, Diane, as Lindsay's parents filed a complaint in State court against defendants American Home Products, Inc.,[1] as the manufacturer of Orimune, and American Home's related or subsidiary companies American Cyanamid and Lederle Laboratories. Plaintiffs alleged, among other things, negligence, strict liability, failure to warn, and fraud in the manufacture and testing of the vaccine received by Lindsay. More specifically, plaintiffs asserted in part that defendants failed to adequately test for and remove a monkey virus known as SV40 from the vaccine. This allegedly caused Lindsay's brain tumor.
Lindsay Rivard was born in 1992 and received Orimune on four occasions between that year and June 1997. In November 1998, she was diagnosed with medulla blastoma, a brain tumor from which she died on October 7, 1999. One of plaintiffs' experts confirmed that molecular tests performed on Lindsay's tumor tissue found the presence of SV40 DNA. Another of plaintiffs' experts also found SV40 in the "tumor cells" but not in the "adjacent non-malignant *292 brain tissue." That expert concluded that this finding "provide[d] powerful evidence that the virus played a role in the causation of the tumor."
These appeals present three issues. The first and second issues, for which the Supreme Court had granted defendants leave to appeal, question whether plaintiffs may, as ordered by the trial court on summary judgment, sue the vaccine manufacturer in State court without first proceeding in the federal Vaccine Court pursuant to the National Childhood Vaccine Injury Act, 42 U.S.C.A. §§ 300aa-1 to -34 (the Act); and whether summary judgment was properly denied defendants, vaccine manufacturers. The third issue, for which we had granted leave to appeal, asks whether discovery of numerous defense documents was properly ordered by the trial court despite allegations of attorney-client and work product privileges.
We reverse the trial court and remand for entry of an order dismissing those portions of the action seeking damages arising from a vaccine-related death, which must in the first instance be brought before the Vaccine Court, directing plaintiffs to exhaust their remedies before the Vaccine Court, and staying the remaining State claims pending the Vaccine Court resolution. In addition, we affirm the trial court's denial of summary judgment to defendants and affirm the trial court's discovery order.

I.

A.
In the early 1960's, the federal government licensed three manufacturers to make and market "live polio vaccines" from the material created by the developer of the first oral polio vaccine, Dr. Albert Sabin. The government granted one of these licenses to defendants American Cyanamid and its Lederle Laboratories.
Historically, the three types of polio virus, Type I, II, and III, were treated with different vaccines. Graham v. Am. Cyanamid Co., 350 F.3d 496, 500 (6th Cir.2003), cert. denied, 541 U.S. 990, 124 S.Ct. 2040, 158 L.Ed.2d 495 (2004). In 1963, however, the federal government granted defendants a license to manufacture and sell a "trivalent vaccine" which worked against all three types of polio virus. Ibid. Defendants developed this vaccine and began distributing it, from the early 1960's until 1999, as Orimune, the vaccine at issue in this appeal. Ibid. See Campagna v. Am. Cyanamid, 337 N.J.Super. 530, 535-39, 767 A.2d 996 (App.Div.) (providing a comprehensive review of the development and licensure of the vaccine), certif. denied, 168 N.J. 294, 773 A.2d 1158 (2001).
Orimune was derived from the original strains of polio virus that Dr. Sabin had developed. To derive the vaccine, defendants took a small amount of Dr. Sabin's strains and neutralized those strains for SV40, which was known to be in the Sabin strains. The neutralization process did not remove SV40 but instead was designed to destroy the virus's ability to infect living cells. The parties, in this case, vigorously contest whether neutralization of the original Sabin polio virus strains with SV40 antiserum sufficiently removed the virulent form of monkey virus from the resulting vaccine.
In any event, to make the vaccine, defendants then multiplied the polio virus contained in the small amount of the original neutralized strain in cultures of monkey kidney cells. The resulting virus was then harvested and pooled with others derived in similar fashion to form a larger volume that was designated as a "seed" to be used in vaccine production.
*293 Defendants then took a small volume of seed, multiplied that virus by again inoculating it into cell cultures of monkey kidneys, harvesting the resulting virus and pooling several harvests of the same type of attenuated poliovirus together into a monopool. Monopool volumes of all three viruses were then "combined" into the trivalent "bulk vaccine lot," which defendants called Orimune.
Because monkey kidney cells were utilized in the production of the vaccine, after neutralization of the Sabin strains, plaintiffs also argue that by utilizing this technique, even though an approved Food and Drug Administration (FDA) production method, defendants further added SV40 to the vaccine.
Federal regulations required that tests be performed on the vaccines at various production stages. Graham, supra, 350 F.3d at 501. Regulations required that "[e]ach seed virus [as contrasted with the Sabin strains] used in manufacture shall be demonstrated to be free of extraneous microbial agents." 42 C.F.R. § 73.110(b)(3)(4) (1962). See In re Sabin Oral Polio Vaccine Prods. Liab. Litig., 743 F.Supp. 410, 420 n. 16 (D.Md.1990) (stating that § 73.110(b)(3) "applies only to seeds"), aff'd, 984 F.2d 124 (4th Cir.1993). In addition, the regulations required testing to ensure that each viral harvest was SV40 free. See 42 C.F.R. §§ 73.113(d), 73.114(a)(5) (1962). Nevertheless, several courts have already concluded that at times in the past defendants and the government breached some of the pertinent federal regulations by releasing vaccines which exceeded the reference vaccine in neurovirulence. See, e.g., In re Sabin Oral Polio Vaccine Prods. Liab. Litig., 763 F.Supp. 811, 829 (D.Md.1991), aff'd, 984 F.2d 124 (4th Cir.1993); Campagna, supra, 337 N.J.Super. at 538-39, 767 A.2d 996.

B.
In 1986, Congress passed the National Childhood Vaccine Injury Act, 42 U.S.C.A. § 300aa-1 to -34 (the Act), to address competing concerns in the area of vaccine-injury compensation. Shackil v. Lederle Labs., 116 N.J. 155, 181-86, 561 A.2d 511 (1989) (reviewing history and purposes of the Act). The Act was designed to assure the nation's demand for an adequate vaccine supply while making certain that those individuals who suffer injury from routine immunizations are adequately compensated in a streamlined, no fault alternative to traditional tort actions.
Under the Act, actions for vaccine-related injuries or deaths, seeking damages in excess of $1,000, must generally first be brought against the United States Secretary of Health and Human Services in the federal court of claims, the so-called "Vaccine Court," 42 U.S.C.A. §§ 300aa-11(a)(2)(A)(i), -12(c). If such a claim is nonetheless filed in state or federal court, "the court shall dismiss the action." 42 U.S.C.A. § 300aa-11(a)(2)(B).
After the Vaccine Court renders its decision and following any appeal, the claimant can either accept the award or decision, or at that point file a civil suit for damages. 42 U.S.C.A. § 300aa-21(a). Statutes of limitations for actions under State law are stayed while claims are adjudicated under the Act. 42 U.S.C.A. § 300aa-16(c).
Among the damages a claimant can potentially recover under the Act are actual unreimbursable expenses; projected medical, therapy and rehabilitation and care expenses; anticipated lost earnings; amounts for actual and projected pain and suffering losses; and, in the event of a vaccine-related death, an award of $250,000. 42 U.S.C.A. § 300aa-15(a). Attorneys fees and costs are also awardable. *294 42 U.S.C.A. § 300aa-15(e). Punitive damages, however, are prohibited under the Act. 42 U.S.C.A. § 300aa-15(a), (d).
The Act extends to "vaccine-related injury or death associated with the administration of a vaccine" in the Vaccine Injury Table. 42 U.S.C.A. §§ 300aa-15(a), -11(c)(1)(A), -14(a). The Table expressly includes oral polio vaccines and inactivated polio vaccines. "A presumption of vaccine-relatedness arises when the injury suffered is listed" in the table and the "first symptoms of the injury" occur within the time specified in the table. Shackil, supra, 116 N.J. at 182, 561 A.2d 511. For such an injury, causation is assumed, and the claimant would not be required to prove that the injury was caused by the vaccine. Even when the claimant does not get the benefit of the presumption because the injury does not meet the table requirements, he or she can still prove causation in fact. 42 U.S.C.A. § 300aa-11(c)(1)(C)(ii); Morris v. Sec'y Dep't of Health & Human Servs., 57 Fed.Cl. 383, 389 (Fed.Cl.2003). Presumably, plaintiffs' allegations that Lindsay's death from brain tumor caused by defendants' vaccine would fall under the "damages arising from a vaccine-related injury or death" provisions of the Act, unless some exception applies. 42 U.S.C.A. § 300aa-11(a)(2)(A).
In this case, the asserted exception is found in the definitions section of the Act, 42 U.S.C.A. § 300aa-33, which provides that "vaccine-related injury or death . . . does not include an illness, injury, condition or death associated with an adulterant or contaminant intentionally added to such a vaccine." 42 U.S.C.A. § 300aa-33(5).

C.
The trial judge in this case reasoned that SV40 "was not an ingredient in the vaccine," that it "served no purpose in the vaccine" and did not preserve, make more effective or aid the vaccine in distribution "through the human body." Instead, "SV40 is a dangerous substance that could have been avoided in the manufacture of Orimune, had the defendants chosen to do so."
As far as the trial court was concerned, "by attempting to neutralize the product, instead of completely removing the SV40, defendants left the contaminant, SV40, in the fluid." The judge further found that "defendants then utilized harvests without performing serological testing. The resulting Seed . . . contained SV40." In addition, the judge found "monkey kidneys were used to prepare Type I[] and Type II seed []. Once again, the jury could conclude that this method of preparation added the virus to the chain." Therefore, the court believed that defendants' actions satisfied the "intentionally added contaminant" standard. We disagree.

II.
In construing a statute, the court gives effect to the Legislature's intent. Coletti v. Union County Bd. of Chosen Freeholders, 217 N.J.Super. 31, 35, 524 A.2d 1270 (App.Div.1987). "Sources of legislative intent are the language of a statute, the policy behind a statute, concepts of reasonableness and legislative history." Ibid. When interpreting a statute, "the basic rule is that the statutory language should be given its ordinary meaning absent specific intent to the contrary." Mortimer v. Bd. of Review, 99 N.J. 393, 398, 493 A.2d 1 (1985).
We do not believe that the trial court's interpretation comports with the ordinary meaning of "intentionally add[ing]" a contaminant or adulterant to the vaccine. In manufacturing the vaccine, defendants began with material already contaminated, which is the Sabin strains, and, in the *295 process of making the vaccine end product, attempted to neutralize it for contamination.
We agree with the trial court that SV40 is unlike thimerosal, which we dealt with in Troxclair v. Aventis Pasteur, Inc., 374 N.J.Super. 374, 382, 864 A.2d 1147 (App.Div.2005). Thimerosal is "a preservative containing mercury." Id. at 377, 864 A.2d 1147. Because thimerosal was a vaccine ingredient purposely added to "deter[] microbial and fungal growth, thereby maintaining the safety, purity and potency of vaccines," id. at 383, 864 A.2d 1147, it was not an adulterant or contaminant under the Act. Id. at 385, 864 A.2d 1147. See also, Holder v. Abbott Labs., Inc., 444 F.3d 383, 385 (5th Cir.2006).
In our view, though SV40 can be considered a contaminant, it was still either an ingredient of, or a microorganism contained within, the vaccine. An "ingredient" is "something that enters into a compound or is a component part of any combination or mixture." Webster's Ninth New Collegiate Dictionary 622 (1985). The definition of vaccines includes "living fully virulent organisms." Owens v. Am. Home Prods. Corp., 203 F.Supp.2d 748, 755 (S.D.Tex.2002). It seems illogical and contrary to the plain meaning of the Act to deem an injury from a vaccine constituent, albeit an undesirable constituent, not "vaccine-related" or not "associated with the administration of a vaccine" when it is present from the inception of the process leading to the creation of the vaccine end product. 42 U.S.C.A. §§ 300aa-11(a)(2)(A), -15(a). In other words, nothing suggests that SV40, though unwanted, was any less a "living virulent organism" than the remainder of the polio vaccine material with which it was a part at the instance of defendants' manufacturing process.
Lindsay Rivard was allegedly injured by SV40, a component of the "vaccine itself" or "something contained therein." See Pannell v. Sec'y of the Dep't of Health & Human Servs., No. 94-658V, 1995 WL 432643 at *1-*2, 1995 U.S. Claims Lexis 143 at *4. (Fed.Cl. July 7, 1995). Her claim fairly implicates a "constituent material of vaccines" and, therefore, should be considered "vaccine-related." Troxclair, supra, 374 N.J.Super. at 384, 864 A.2d 1147. This is not a case where injuries were caused by "exposure to a foreign substance purposefully introduced into the vaccine." Amendola v. Sec'y, Dep't of Health & Human Servs., 989 F.2d 1180, 1186 (Fed.Cir.1993).
Even if SV40 is not an "ingredient" of or "microorganism" within the vaccine, the exception still would not apply because defendants did not "intentionally add" SV40 to the vaccine. Rather, they attempted to neutralize its presence. Producing a vaccine that will medically benefit many thousands but may adversely affect some due to a dangerous component in the vaccine whose virulence may not have been completely neutralized cannot be considered the equivalent of purposefully adding the dangerous component to the vaccine.
If SV40 in the neutralized strain had been infectious, it would have multiplied and been present in vastly greater quantities at each subsequent manufacturing stage. Instead, plaintiffs admitted that their experts detected "quantities of SV40 DNA one passage beyond the neutralized strain material that were smaller than what they detected in the neutralized strain material, and they did not detect any SV40 DNA in any sample downstream from that point." Furthermore, as defendants contend, "[n]o one, including Plaintiffs' experts, has found infectious SV40 in any of the materials tested, including the *296 neutralized Sabin strains in which DNA was found."
Even if the neutralization was not completely effective, the fact that defendants neutralized, or at least in good faith attempted to neutralize, the SV40 tends to negate any suggestion of an intention to add an adulterant or contaminant, and in fact indicates the exact opposite. Whether or not SV40 could have and should have been removed instead of attempting to neutralize the virus, the Act's exception is not implicated by the manufacturer's negligence or incompetence. It is only reasonable to conclude that, if nothing else, defendants' addition of the serum to neutralize the SV40 shows their intention not to produce or manufacture an adulterated or contaminated vaccine.
Whether defendants might have manufactured the vaccine more competently or even less negligently, may become relevant if the matter proceeds to trial, but such conduct is not dispositive when determining whether the exception applies because the exception requires purposeful or intentional contamination or adulteration.
Hoping to imply an intention to use contaminated tissue from knowledge of the existence of SV40, among other items plaintiffs point to a 1961 memo which they say "document[s]" the presence of "contaminated seeds." But in fact the memo cited, evidently from one of defendants' scientists or technicians, asks for permission, putatively from superiors, to discard "various monovalent harvests . . . not satisfactory for use," thereby evincing defendants' attempts not to use deleterious materials. Moreover, based on the record copy's countersignatures, it appears that approval for the discarding of such material was given for almost all of the "harvests" referenced, including the only one described as "contaminated," and, in the case where a few harvests were directed to be retained, plaintiffs fail to explain how retention of such material by the testing lab equates to an intent to use contaminated matter in the production of vaccines. Furthermore, the record also reflects that defendant Lederle tested monopool harvests for the presence of SV40 and submitted these test results to the FDA before using them to make vaccines. See 42 C.F.R. § 73.114(a) (1962).
While the trial court reasoned in part that the three types of vaccine product "were exposed to more SV40 throughout the manufacturing process" as they "were combined or added together to create the vaccine," nothing suggests defendants ever wavered from their intent that the serum neutralize any infectious SV40, no matter how many times the vaccine product was combined, recombined, or diluted during production.
Whether or not the monkey kidney tissue used in the manufacturing process contained SV40, the utilization of such tissue was FDA approved.[2]See 42 C.F.R. § 73.110(b) (1962); 42 C.F.R. § 73.112(a) (1962). The possible inclusion of SV40 within the monkey tissue can be considered a risk the FDA was willing to assume in order to produce the vaccine. See Shackil, supra, 116 N.J. at 184-85, 561 A.2d 511.
In any event, the record contains evidence of the various procedures defendants used to ensure that contaminated monkey tissues were not used for production. Even if the procedures were defectively implemented or even poorly *297 conceived, an intention to adulterate or contaminate still cannot logically be inferred.
There is no evidence that defendants, knowing that infectious SV40 was in the monkey tissue, purposely used the contaminated tissue in the manufacturing process. At best the relevant evidence could support an inference that some of the tissue might have been contaminated with SV40. From this inference, however, one cannot conclude that defendants purposely contaminated the product. There is nothing in the record to indicate that defendants knowingly used any monkey tissue in production that had failed their SV40 tests and protocols.
Given the ordinary understanding of the statutory language contained in the Act's exception, and especially considering defendants' neutralization effort, the use of approved tissue cannot be considered the intentional adding of an adulterant or contaminant in order to make the product impure, inferior, adulterated, or contaminated. See Leroy v. Sec'y of Dep't of Health and Human Servs., No. 02-392V, 2002 WL 31730680, at *5, 2002 U.S. Claims Lexis 284, at *18 (Fed.Cl. Oct. 11, 2002). Instead, defendants' actions constituted authorized vaccine production steps.
"One of the purposes of the Act was to keep manufacturers of vaccines in the market" given that such manufacturers had presented Congress with evidence that the costs related to tort insurance and defense "`had begun to dwarf their vaccine production revenues.'" McDonald v. Lederle Labs., 341 N.J.Super. 369, 377, 775 A.2d 528 (App.Div.2001). Broadly construing the exception, especially in the face of this congressional purpose, would run afoul of the ordinary rule of statutory construction requiring a narrow construction of exceptions to statutory schemes. Young v. Schering Corp., 141 N.J. 16, 25, 660 A.2d 1153 (1995).
Therefore, we find the plain language of the exception, requiring intentional adulteration or contamination, not to apply to this dispute. Under the Restatement (Second) of Torts, "[t]he word 'intent' is used . . . to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts § 8A (1965). In short, considering defendants' production actions, we cannot conclude that defendants intentionally wanted to contaminate or adulterate their oral polio vaccine.
Because we rely on the plain meaning of the exception, we specifically decline to address the United States' amicus position that the exception pertains only "to cases asserting claims associated with substances intentionally added to the vaccine end product in order to make it impure, inferior or contaminated." Thus, we take no position on amicus' argument that the exception applies only to end-product tampering.
Accordingly, we conclude that plaintiffs' claims pertaining to Lindsay Rivard's vaccine-related injury and death are subject to the Act and that upon remand to the trial court those claims must be dismissed. From the dismissal of the claims, plaintiffs shall have one year to file before the Vaccine Court. 42 U.S.C.A. § 300aa-11(a)(2)(B). See Brown v. Sec'y of Health & Human Servs., No. 97-5010, 111 F.3d 145, 1997 WL 187413 at *1, 1997 U.S.App. Lexis 7616 at *2 (Fed. Cir. April 17, 1997).

III.
In defendants' second issue they assert entitlement to summary judgment because no reasonable jury could conclude either that Lindsay's vaccine contained SV40 or that SV40 causes human *298 cancer. In view of our decision that plaintiffs' claims pertaining to Lindsay's death must be filed with the Vaccine Court, an argument could be made that this issue is moot. We elect to consider the issue, however, because some of plaintiffs' claims remain viable in State court. That portion of this dispute pertaining to loss of services by Lindsay's parents, for example, need not be exhausted in the Vaccine Court. McDonald v. Lederle Labs. II, 366 N.J.Super. 555, 563-64, 841 A.2d 948 (App. Div.2004). See also Schafer v. Am. Cyanamid Co., 20 F.3d 1, 5 (1st Cir.1994) (holding that a consortium claim is not covered by the Act); McDonald I, supra, 341 N.J.Super. at 380, 775 A.2d 528 (holding that "a person who cannot file a petition for compensation" under the Act cannot be banned from filing a State court action). In addition, the entire case may return to State court after the matter is pursued in the Vaccine Court. Accordingly, we have addressed the summary judgment issue.
To withstand defendants' summary judgment motion in this case, plaintiffs must point to sufficient evidence supporting a reasonable jury's factual finding that the vaccine administered to Lindsay Rivard was "defective" or "unreasonably dangerous" because it contained SV40. See, e.g., Coffman v. Keene Corp., 133 N.J. 581, 593, 628 A.2d 710 (1993). In establishing this factual dispute, plaintiffs must be credited with all reasonable inferences that can be drawn from the evidence. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
It is clear, at the very least, that defendants' Type III vaccine initially included infectious SV40 beginning with the master seeds, and that the Type I and Type II vaccines tested positive for SV40 beyond neutralization; that for some period following development of Orimune defendants were permitted to place into the stream of commerce, with the government's permission if not its outright encouragement, vaccines which did not meet the standards of purity; and that while none of the tested monopools or trivalent bulks from which Lindsay's vaccination could have been produced tested positive for SV40, plaintiffs' experts have questioned the reliability of those tests.
At least one of plaintiffs' expert witnesses has opined that the applicable regulations required the manufacturer to demonstrate its product was free of extraneous microbial agents, and that defendants failed to meet those regulations. The expert further stated that SV40 continued to be present in defendants' vaccines and in the ones which Lindsay received. In one instance, for example, defendants' historical records noted some extraneous virus in a monopool that defendants admit had been used in Lindsay's vaccine. Although defendants dispute the virus's virulence, on summary judgment we must view plaintiffs' evidence liberally. Thus, though defendants question this expert's opinions, in our view a jury question was created.
Regarding the link between SV40 and Lindsay's tumor, here again, one of plaintiffs' experts reports finding SV40 in Lindsay's tumor, which is sufficient to establish a jury question, even if the epidemiological evidence on the causation question generally is equivocal. See Ferebee v. Chevron Chem. Co., 736 F.2d 1529, 1536-37 (D.C.Cir.) (finding that cause-effect relationship need not be established with epidemiological studies so long as the expert's opinion is otherwise based on sound methodology), cert. denied, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).
When plaintiffs' expert proofs are considered along with the recognized early failings to comply with the federal regulations and the issuance of potentially unsafe vaccines, it seems clear to us that summary *299 judgment in favor of defendants was inappropriate.[3] Therefore, we agree with the trial court's decision denying the defendants summary judgment.

IV.
Defendants' third issue involves the discovery objections. Though plaintiffs' claims relating to Lindsay's death must be dismissed in State court and submitted to the Vaccine Court, the trial court's discovery order also pertains to two other related cases, Moreno v. American Home Products, Inc. and Gannon v. American Home Products, Inc. According to the parties at oral argument, these cases have been stayed by the trial court pending determination by this court of the discovery dispute and at least one of these cases is admittedly not within the Vaccine Court's jurisdiction. Consequently, to assist the parties, we address the discovery question.
Defendants argue that the trial judge ceded his responsibility to a special master by directing that the master's rulings were to be considered his rulings. Although this appears to be so, the judge also authorized defendants to appeal directly to him for a stay "regarding documents claimed to be privileged." Instead of proceeding in this manner, defendants pursued an interlocutory appeal.
The order entered by the court was somewhat unorthodox and improperly declared that the in-camera review of documents by the special master is to be "considered by this Court as this Court's review of the said documents, and [the master's] rulings are considered by this Court as if it was this Court's own rulings." Nevertheless, over 7,000 documents were in dispute. Consequently we cannot find that the trial court abused its discretion by placing the burden on defendants to move to stay disclosure with more specific privilege arguments focused on individual documents. This seems to us to be an efficient means for the judge to exercise his discretion over the large number of disputed documents. See Mango v. Pierce-Coombs, 370 N.J.Super. 239, 258, 851 A.2d 62 (App.Div.2004); Sparwick Contracting v. Tomasco Corp., 335 N.J.Super. 73, 79-80, 761 A.2d 90 (App.Div.2000).
When a party asserts a privilege, it must provide a "`specific explanation of why each document is privileged or immune from discovery [which] must include a comprehensive presentation of all factual grounds and legal analyses in a non-conclusory fashion.'" Seacoast Builders Corp. v. Rutgers, 358 N.J.Super. 524, 542, 818 A.2d 455 (App.Div.2003) (quoting Pippenger v. Gruppe, 883 F.Supp. 1201, 1212 (S.D.Ind.1994)). Our rules require similar specificity by requiring the party to "make the claim expressly and . . . describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege protection." R. 4:10-2(e)(1).
Had defendants moved to stay or to reverse the ordered disclosure of each document it seriously believed the special master had mistakenly handled, we have confidence that the judge would have sufficiently explained why he adopted, modified, or rejected the special master's report pertaining to that particular document. R. 4:41-5(b).
*300 Because defendants chose not to seek a stay, we have neither specific objections by defendants nor rulings by the trial court pertaining to these specific objections. Even on appeal, defendants attacked documents ruled discoverable in categories. This is unacceptable.
Given the court's order, it is incumbent upon defendants to raise before the trial court each privilege-based-objection they have regarding specific documents the trial court has ordered disclosed. Upon review of each document, "the trial court must explain as to each document deemed privileged why it has so ruled." Seacoast, supra, 358 N.J.Super. at 542, 818 A.2d 455. A court may not abdicate its "supervisory duty over a master." See St. Joseph's Hosp. and Med. Ctr. v. Muirfield Const. Co., 362 N.J.Super. 540, 551-52, 829 A.2d 652 (App.Div.2003).
For the assistance of the parties, we summarize the pertinent legal principles pertaining to the attorney-client and work product privileges. Pursuant to N.J.S.A. 2A:84A-20 and N.J.R.E. 504, confidential communications between client and attorney in the course of a professional relationship are privileged. In re Envtl. Ins. Declaratory Judgment Actions, 259 N.J.Super. 308, 313, 612 A.2d 1338 (App. Div.1992). "A communication made in the course of relationship between lawyer and client shall be presumed to have been made in professional confidence unless knowingly made within the hearing of some person whose presence nullified the privilege." R. 504(3). Despite the presumption of confidentiality, "the essence of the privilege" is limited to communications intended to be confidential. State v. Schubert, 235 N.J.Super. 212, 220-21, 561 A.2d 1186 (App.Div.1989), certif. denied, 121 N.J. 597, 583 A.2d 302 (1990).
The attorney-client privilege is not restricted to legal advice, though "[t]he privilege is limited to those situations in which lawful legal advice is the object of the relationship." In re Gonnella, 238 N.J.Super. 509, 512, 570 A.2d 53 (Law Div.1989). For example, we have found privileged under both attorney-client and work product a chronology of events occurring during a hospitalization which a malpractice plaintiff was asked by his lawyer to prepare to facilitate representation. Hannan v. St. Joseph's Hosp., 318 N.J.Super. 22, 27-28, 722 A.2d 971 (App.Div. 1999).
Furthermore, the privilege can extend to non-attorneys in some cases. "[T]he privilege regarding confidential communications between an attorney and client `extends to the necessary intermediaries and agents whom the communications are made.'" State v. Davis, 116 N.J. 341, 361, 561 A.2d 1082 (1989).
There is no time limit on the attorney-client privilege. Paul Rice, Attorney-Client Privilege: New Jersey State Law § 2.5 (2d ed. 1999) (privilege continues "indefinitely"). Our Supreme Court has noted that the privilege survives the termination of the attorney-client relationship. Davis, supra, 116 N.J. at 362, 561 A.2d 1082. Waiver of the privilege can only occur through "the client, not counsel." Ibid.
Even though the attorney-client privilege is weighty, it is not absolute. Sometimes privileged communications may be required to be revealed because of "overriding public concern." United Jersey Bank v. Wolosoff, 196 N.J.Super. 553, 563, 483 A.2d 821 (App.Div.1984). Indeed, our Supreme Court has fashioned a three-part-test to determine when the privilege must yield to other important societal *301 concerns. In re Kozlov, 79 N.J. 232, 243-44, 398 A.2d 882 (1979).
The "work product" doctrine "protects from disclosure those documents and other tangible things that a party or a party's representative prepares in anticipation of litigation." Laporta v. Gloucester County Bd. of Chosen Freeholders, 340 N.J.Super. 254, 259, 774 A.2d 545 (App. Div.2001). Generally, a document will be deemed to have been prepared in anticipation of litigation when the dominant purpose in its preparation was concern for potential litigation, the prospect of which was objectively reasonable. Miller v. J.B. Hunt Transp., Inc., 339 N.J.Super. 144, 150, 770 A.2d 1288 (App.Div.2001). The fact that the documents sought for discovery "do not necessarily include legal advice is as a matter of law, irrelevant." In re Ford Motor Co., 110 F.3d 954, 968 (3d Cir.1997).
The work product privilege is not absolute and can be disregarded "upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means." R. 4:10-2(c). When a court orders such discovery, however, "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Ibid.; Jenkins v. Rainner, 69 N.J. 50, 55, 350 A.2d 473 (1976) (finding absolute immunity for "`mental impressions, conclusions, opinions, or legal theories of any attorney or other representative of a party'").
All documents and materials sought in discovery must of course be "relevant to the subject matter involved in the pending action," meaning that "the information sought appears reasonably calculated to lead to the discovery of admissible evidence." R. 4:10-2(a). Thus, the question with stale documents does not relate to whether the privileges cover old documents, because they do. Rather the question with old documents is whether the document is relevant to the pending action and potentially discoverable in the absence of any privilege.
Accordingly, we affirm the trial court and remand to allow defendant to raise specific objections to the special master's rulings that will enable the trial court to render a proper decision as to each document claimed privileged by defendants.

V.
In conclusion, on the first issue approved for interlocutory review, we reverse the trial court's determination that plaintiffs' claims relating to Lindsay Rivard's death need not be heard initially by the Vaccine Court. We remand for the trial court to dismiss her action seeking "damages arising from a vaccine-related . . . death associated with the administration of a vaccine. . . ." 42 U.S.C.A. § 300aa-11(a)(2)(A).
We agree that certain of plaintiffs' claims remain viable in State court because the Vaccine Court does not include relief for such claims, such as punitive damage and her parents' loss of Lindsay's services. We also recognize that there does not appear to be any current bar to allowing the two actions to proceed simultaneously. See Schafer, supra, 20 F.3d at 6 (noting that a family's state law per quod claims need not necessarily await completion of the related proceeding before the Vaccine Court).
However, we believe that it would be neither economical nor efficient to allow plaintiffs to proceed in State court on their *302 remaining claims while simultaneously pursuing the Vaccine Court remedies. Because the major claims will proceed in the Vaccine Court, we believe the viable State claims should be stayed pending resolution of the federal claims.
Regarding the remaining two issues approved for interlocutory review, we affirm the trial court's rulings denying defendants summary judgment and all rulings entered thus far on discovery, subject of course to defendants seeking to stay and reverse the ordered discovery pertaining to any of the individual documents previously ordered disclosed.
The trial court's ruling on issue one is reversed. The court's rulings on issues two and three are affirmed, and the matter is remanded for further proceedings not inconsistent with this decision.
NOTES
[1] At some point American Home became Wyeth.
[2] Until 1982, the regulations were enforced by the Division of Biological Standards, which was a division of the National Institutes of Health. Campagna, supra, 337 N.J.Super. at 535 n. 2, 767 A.2d 996.
[3] Our independent review of the record before the trial judge makes moot defendants' claim that they were aggrieved by the judge's putative use of counsel's certification in denying them summary judgment.